1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK ANTHONY BAILEY,<br><br>          **Plaintiff,**<br><br>   **v.**<br><br>OAKDALE POLICE DEPARTMENT, THE<br>CITY OF OAKDALE, OAKDALE<br>POLICE OFFICER BRIAN SHIMMEL,<br>individually and in his<br>official capacity, OAKDALE<br>POLICE OFFICER BRIAN SHIMMER,<br>individually and in his<br>official capacity, OAKDALE<br>POLICE OFFICER TAYLOR,<br>individually and in his<br>official capacity,<br><br>          **Defendants.** | 1:05-CV-00113 OWW SMS<br><br>**MEMORANDUM DECISION AND ORDER<br>GRANTING IN PART DENYING IN<br>PART DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT** |

## 1.   INTRODUCTION

    This matter comes before the court on Defendants' motion for summary judgment of Plaintiff Mark Anthony Bailey's ("Bailey" or "Plaintiff") claims.  Bailey brings this action under 42 U.S.C. § 1983 alleging a pattern and practice of violation of civil rights by the Oakdale Police Department in violation of the Fourth and Fourteenth Amendments.

## 2.   PROCEDURAL BACKGROUND

    On February 7, 2005, Plaintiff filed a first amended complaint. (Doc. 9, First Amended Complaint.)  On November 18,

**1**

1  2005 Plaintiff's attorney withdrew from the case.  (Doc. 37,
2  Motion to Withdraw as Attorney.)  On December 13, 2006 Defendants
3  filed a motion for summary judgment.  (Doc. 46, Motion for
4  Summary Judgment.)  Plaintiff opposed the motion on February 12,
5  2007.  (Doc. 54, Pl.'s Opposition.)  Defendants filed their reply
6  on February 20, 2007.  (Doc. 59, Reply to Opposition.)

7      A hearing for this motion was scheduled on March 12, 2007.
8  At the hearing Mr. Bailey requested additional time to secure an
9  attorney and obtain an expert witness.  Mr. Bailey was given
10 thirty days to secure an attorney and file an opposition.  (Doc.
11 65, Minutes, Filed March 12, 2007.)

12     Bailey engaged an attorney and filed a second opposition on
13 April 13, 2007.  (Doc. 71, Opposition.)  On April 27, 2007
14 Defendants filed a reply to Bailey's second opposition.  (Doc.
15 77, Reply.)

16                    **3.   FACTUAL BACKGROUND**

17     **A.   Disputed Facts**

18          **i.   The Arrest**

19     On February 24, 2004, at approximately 8:30 p.m., Oakdale
20 Police Officer Shimmel was dispatched to a hit and run call of a
21 motorcycle hitting a fence.  (DSUF, No. 29.)  Officer Shimmel was
22 about to make a call to the reporting party, when, while he was
23 stopped at the intersection of Orsi Road and Sierra Road, he saw
24 a motorcycle traveling at a high rate of speed.  (DSUF, No. 30.)
25 Officer Shimmel activated his emergency lights as Bailey passed
26 his patrol car.  (DSUF, No. 31.)  Bailey accelerated his
27 motorcycle to evade the traffic stop.  (DSUF, No. 32.)  Officer
28 Shimmel accelerated his patrol car to catch up with Bailey and

**2**

turned northbound on View Point Avenue.  (DSUF, No. 33.)  Bailey again looked back at Officer Shimmel and accelerated at a high rate of speed causing the motorcycle to fishtail.  (DSUF, No. 34.)  Bailey then accelerated through the intersection of View Point and East "J" Street.  The intersection is controlled by stop signs.  (DSUF, No. 35.)

Officer Shimmel was on the radio with dispatch to notify them he was in pursuit when Bailey lost control of the motorcycle in the cul-de-sac at the end of View Point Avenue and Gold Rush Court.  (DSUF, No. 36.)  Officer Shimmel saw the motorcycle hit a parked car in front of a residence and then Bailey jumped up and took off running on foot leaving the motorcycle at the scene. (DSUF, No. 37.)  The address of the collision was 1414 Gold Rush Court.  (DSUF No. 38.)  Mr. Bailey jumped over a fence at this location to evade Officer Shimmel and to avoid arrest.  (DSUF No. 39.)

Officer Shimmel began to pursue Bailey on foot and eventually came to a fence that had a fifteen foot drop on the other side.  (DSUF, No. 40.)  Mr. Fowler, the owner of the parked car, advised Officer Shimmel that Bailey jumped the fence. (DSUF, No. 41.)  Robert Staves, the next door neighbor advised Officer Shimmel that Bailey was on the ground on the other side of the fence and it looked like he was hurt.  (DSUF, No. 42.) Mr. Staves had a flashlight on Bailey.  (DSUF, No. 43.)  Officer Shimmel notified dispatch of Bailey's location.  (DSUF, No. 44.) Officer Shimmel advised Mr. Staves and Mr. Fowler to get on the phone with the Oakdale Police Department and keep them informed of Mr. Bailey's actions.  (DSUF, No. 45.)  Officer Shimmel drove

around the residential area to Cottles Wood Park and entered Oakdale Junior High School from the west side of the school. (DSUF, No. 46.)

Officer Taylor entered the school from the east side. (DSUF, No. 47.)  Officer Taylor ran through the walkway entrance because all the driveway entrances were locked up.  (DSUF, No. 13.)  When Officer Taylor first came upon Bailey, he was laying on his stomach with his arms underneath him and his legs straight out. (DSUF, No. 17.)  Officer Taylor then took his gun and pointed it at Bailey while waiting for backup.  (DSUF, No. 18.) A few moments later, Officer Shimmel, Sergeant Semore, Detective Savage and Detective Perez arrived. (DSUF, No. 19.)

Officer Shimmel asked Bailey if he was hurt but Bailey's speech was slurred.  (DSUF, No. 48.)  When Officer Shimmel rolled Bailey over to pat him down, he could smell alcohol on his breath.   (DSUF, No. 49.)

Officer Shimmel immediately called an ambulance to be dispatched to the officers' location because Bailey was not moving and he had complained of pain in his right leg.  (DSUF, No. 50.)

At the hospital, Officer Shimmel had a nurse draw blood from Bailey for a blood alcohol test.  (DSUF, No. 51.)  Ultimately, Officer Shimmel was informed the blood alcohol was .22.  (DSUF, No. 52.)  While the nurse was drawing Bailey's blood, Officer Shimmel noticed that Bailey's right knee was swollen.  (DSUF, No. 53.)

Defendants argue that at the time an ambulance was requested Bailey was limping, but was not complaining of any pain. (DSUF,

**4**

No. 22.)  Defendants claim that at no time did the officers know of, nor did they have reason to believe the extent of plaintiff's injury was anything other than a sprain or twist type injury. (DSUF, No. 24.)  The officers state that they did not believe nor did they have reason to believe the injury was serious.  (DSUF, No. 25.)

On the date of the incident, Sergeant Semore was in his patrol unit when he heard a call on the radio that officer Shimmel was in pursuit with a motorcycle.  (DSUF, No. 61.) Sergeant Semore could actually hear the motorcycle over the radio.  (DSUF, No. 62.)  Sergeant Semore then drove towards the area of Cottles Wood Park.  (DSUF, No. 63.)  Sergeant Semore then exited his patrol unit and ran towards the pedestrian entrance. (DSUF, No. 64.)  Sergeant Semore asked officer Shimmel what was going on and officer Shimmel advised him that he had chased Mr. Bailey, that Mr. Bailey jumped over the fence, and that Mr. Bailey had injured his leg. (DSUF, No. 66.)  Sergeant Semore could see no visible signs of injury such as swelling or blood through the jeans. (DSUF, No. 69.)  Sergeant Semore asked Bailey if he could walk but Bailey did not answer.  (DSUF, No. 70.) Because Bailey seemed very intoxicated, Sergeant Semore asserts he told Bailey to focus and Bailey responded that he could walk. (DSUF, No. 71.)

According to Defendants, Sergeant Semore ordered officers to assist Bailey to the ambulance.  (DSUF, No. 73.)  While the officers were assisting Bailey to the ambulance, Sergeant Semore walked behind him and shined his flashlight on Bailey's legs and feet to again see if there were any visible signs of injuries to

**5**

his legs.  (DSUF, No. 74.)  Sergeant Semore did not see any
visible signs of injury to Bailey's legs but he did see Bailey
walking with a limp.  (DSUF, No. 75.)  Defendants claim the
officers supported Bailey's weight while they assisted him.
(DSUF, No. 76.)

After the officers walked about 1 to 20 yards while
assisting Mr. Bailey and holding most of his weight so that it
was not upon his leg, Sergeant Semore then took over for an
officer and assisted Mr. Bailey to the ambulance.  (DSUF, No.
77.)  Sergeant Semore only walked about 20-25 yards when he was
relieved by Detective Perez (DSUF, No. 78.)

Sergeant Semore continued to walk with the officers until
they were through the entrance of the park area where Bailey was
laid down.  (DSUF, No. 79.)  The ambulance arrived just as the
officers got to the entrance and Bailey was then transported by
ambulance to Oak Valley Hospital.  (DSUF, No. 80.)

Bailey was drinking white russians but does not remember how
many.  (DSUF, No. 106.)  Mr. Bailey does not recall saying
anything to the officers.  (DSUF No. 122.)

### ii.  Policy Pattern or Practice of Discrimination

As Chief of Police, Chief Hampton is aware of all policies
and practices at the time of this incident, in February 2004.
(DSUF, No. 84.)

According to the Defendants, the City of Oakdale Police
Department has never had a policy, practice or custom, written or
otherwise, authorizing or condoning unlawful seizures of persons
including the use of unlawful force in violation of the United
States Constitution.  (DSUF, No. 85.)  Furthermore, the police

**6**

1   department has never had a policy, practice or custom to deny
2   persons in the custody of police personnel immediate medical
3   attention.  (DSUF, No. 86.)

4       In addition, the City does not have a custom, policy and
5   practice that encourages, tolerates, or ratifies the employment,
6   deployment and retention of persons and peace officers who search
7   or seize persons in an unlawful manner.  (DSUF, No. 87.)

8       Prior to hiring of a police officer, there is an extensive
9   background investigation of applicants pursuant to the Commission
10  on Peace Officer Standards of Training guidelines (hereinafter
11  "P.O.S.T."), including a psychological examination and
12  evaluation.  (DSUF, No. 88.)  The City requires extensive and
13  lawful training of police officers at certified academies.
14  (DSUF, No. 89.)

15      All Oakdale police officers attend P.O.S.T. certified
16  academies which provide training that complies with the laws of
17  the State of California and the standards set by the Commission
18  on Peace Officer Standards and Training.  (DSUF, No. 90.)

19      The Commission on P.O.S.T. is the entity that establishes
20  the standards that must be met by law enforcement agencies and
21  peace officers in California.  (DSUF, No. 91.)  Once employed by
22  the City of Oakdale, all sworn officers are required to complete
23  at least 24 hours of P.O.S.T. certified training every 24 months.
24  (DSUF, No. 92.)

25      The Department regularly offers current P.O.S.T. courses as
26  part of the ongoing training provided to all employees.  (DSUF,
27  No. 93.)  In addition, continuous in-house training is provided
28  which includes legal law enforcement updates provided by the

**7**

Office of the local District Attorney, dissemination of the
monthly training bulletins from the FBI and other legal updates
from the California Peace Officers' Association, California
Chiefs of Police Association and the International Chiefs of
Police Association.  (DSUF, No. 94.)

In addition, supervisors at the Oakdale Police Department
provide continuous training in briefings through discussions of
current cases and issues involving law enforcement.  (DSUF, No.
95.)  With regard to this incident addressed in this litigation,
the City of Oakdale, by and through its police department, did
not set in motion, a series of acts by others, or knowingly
refuse to terminate a series of acts by others, which it knew or
reasonably should have known or was plainly obvious, would cause
others to inflict constitutional injury.  (DSUF, No. 96.)

In summary, the City undertakes a number of measures to
monitor and ensure that unlawful acts or other misconduct does
not occur.  (DSUF, No. 97.)  These include the following: a)
review procedure when there is an allegation of misconduct; b)
close monitoring, review and supervision of police officers; c)
administrative inquiries; d) internal affairs investigations; e)
citizen complaint procedures; f) disciplinary proceedings and
measures; g) extensive basic academy training and continuous in
service training of officers; h) compliance with P.O.S.T.
standards.  (DSUF, No. 98.)  No evidence exists to show Police
Chief Gary Hampton ("Chief Hampton") had any knowledge of the
incident.

Chief Hampton was not present during the arrest of
plaintiff, nor did he direct others who were involved in the

**8**

incident.  (DSUF, No. 99.)  There is no evidence chief Hampton

had any subsequent participation in the case and no allegation or

evidence exists to show that before this claim was asserted that

any notice was provided to him of the incident.

### iii. Dr. Blaisdell

F. William Blaisdell, M.D. ("Dr. Blaisdell") cannot provide

the exact number of popliteal artery injuries he has seen.  He

believes through a lifetime of practice, he has examined and

treated more popliteal artery injuries than any surgeon in the

United States.  (DSUF, No. 129.)  Dr. Blaisdell has reviewed

Bailey's medical records.  These include the admitting and

discharge summary notes from Oakdale Hospital and Doctors'

Medical Center in Modesto as well as the x-rays and operative

notes.  (DSUF, No. 130.)  In addition to this, Dr. Blaisdell has

only relied on his own personal knowledge of this injury.  In

this regard, he can also state that this injury commonly results

in limb amputation, primarily in young, active men.  (DSUF, No.

131.)

### B.   Undisputed Facts

Upon arrival at the scene, Sergeant Semore looked at

Bailey's leg with a flashlight.  (DSUF, No. 67.)  Bailey was

wearing jeans and boots.  (DSUF, No. 68.)

It was determined that Bailey required emergency surgery for

internal bleeding on his right leg.  (DSUF, No. 54.)  Bailey was

transported to Doctors Medical Center in Modesto for surgery.

(DSUF, No. 55.)

Mr. Bailey has been convicted of felonies.  (DSUF. No. 100.)

Mr. Bailey has been convicted for Marijuana and transportation of

**9**

1  Methamphetamine (DSUF. No. 101.)  He was convicted in 1999.

2  (DSUF. No. 102.)

3      On the night of the incident, Mr. Bailey had some drinks at

4  a place called Whiskey River.  (DSUF. No. 103.)  Mr. Bailey

5  arrived at the Whiskey River at about 5:00 p.m.  (DSUF. No. 104.)

6  Mr. Bailey left the bar at about 7:30 p.m.  (DSUF. No. 105.)

7  When Mr. Bailey got home his girlfriend was physically and

8  verbally angry at him for being late.  (DSUF. No. 107.)  Mr.

9  Bailey left on his motorcycle.  (DSUF. No. 108.)  Mr. Bailey was

10 driving, missed a turn, and went up on the curb.  (DSUF. No.

11 109.)  He then turned on to Orsi and went down Sierra Street.

12 (DSUF. No. 110.)  Mr. Bailey was not sure he was going over the

13 speed limit.  (DSUF. No. 111.)

14      Mr. Bailey saw a patrol car, got scared because he thought

15 he might be arrested.  (DSUF. No. 112.)  He knew the police were

16 following him and wanted him to pull over.  He saw that the

17 police car lights were activated.  (DSUF. No. 113.)  So he parked

18 his motorcycle and ran because he was scared.  (DSUF. No. 114.)

19 Mr. Bailey then jumped a fence and ran in someone's backyard.

20 (DSUF, No. 115.)  He then jumped another fence and hurt his knee.

21 (DSUF. No. 116.)  He estimates that the fence was six foot on the

22 side he jumped from and 12 to 13 foot drop on the other side.

23 (DSUF. No. 117.)  He could not run anywhere.  So, he in effect

24 gave up at that point.  (DSUF. No. 118.)  The police came.

25 (DSUF. No. 120.)  He was handcuffed.  (DSUF. No. 121.)  He does

26 not recall which officers took him to the ambulance.  (DSUF. No.

27 123.)  Once Mr. Bailey passed through the gate, he was placed on

28 a gurney and then put into the ambulance.  (DSUF. No. 124.)  His

**10**

1  knee hurt.  It felt like it was sprained and twisted.  He did not

2  think it was broken.  (DSUF. No. 125.)

3      Gary Hampton is the Chief of Police for the City of Oakdale

4  at the time of this incident.  (DSUF, No. 81.)  He is currently

5  the Chief of Police for the Turlock Police Department.  (DSUF,

6  No. 82.)  As the Chief of Police, Chief Hampton was responsible

7  for the Oakdale Police Department's policies and practices and

8  for all aspects of police administration and conduct.  (DSUF, No.

9  83.)

10      Dr. Blaisdell is a professor of Surgery and Chair of Surgery

11  at UC Davis School of Medicine.  (DSUF, No. 126.)  Dr.

12  Blaisdell's qualifications include Vascular Surgery.  (DSUF, No.

13  127.)

## 4.  <u>LEGAL BACKGROUND</u>

### A.  Summary Judgment Standard

16  Summary judgment is warranted only "if the pleadings,

17  depositions, answers to interrogatories, and admissions on file,

18  together with the affidavits, if any, show that there is no

19  genuine issue as to any material fact."  Fed. R. Civ. P. 56(c);

20  *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).

21  Therefore, to defeat a motion for summary judgment, the non-

22  moving party must show (1) that a genuine factual issue exists

23  and (2) that this factual issue is material.  *Id*.  A genuine

24  issue of fact exists when the non-moving party produces evidence

25  on which a reasonable trier of fact could find in its favor

26  viewing the record as a whole in light of the evidentiary burden

27  the law places on that party.  *See Triton Energy Corp. v. Square

28  D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  Facts are "material" if they "might affect the outcome of the suit under the governing law."  *Campbell*, 138 F.3d at 782 (quoting *Anderson*, 477 U.S. at 248).

The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986).  The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment.  *See United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the evidence must be viewed in a light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  A court's role on summary judgment is not to weigh evidence or resolve issues;

**12**

1   rather, it is to determine whether there is a genuine issue for

2   trial.  *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th

3   Cir. 1996).

4       **B.   Summary Judgment in a Qualified Immunity Case**

5       In this case, Defendants assert the defense of qualified

6   immunity on behalf of all the individual defendants.  Deciding

7   qualified immunity entails a two-step analysis.  First, a court

8   must ask whether a constitutional violation occurred at all.  If

9   the answer to this question is yes, the court must then inquire

10  whether the right violated was "clearly established" by asking

11  whether a reasonable officer could believe that the defendant's

12  actions were lawful.  *See Saucier v. Katz*, 533 U.S. 194, 201

13  (2001).

14      The traditional summary judgment approach should be used in

15  analyzing the first step of the *Saucier* analysis:

16          A court required to rule upon the qualified immunity

17          issue must consider, then, this threshold question:

18          Taken in the light most favorable to the party

19          asserting the injury, do the facts alleged show the

20          officer's conduct violated a constitutional right?

21          Where the facts are disputed, their resolution and

22          determinations of credibility are manifestly the

23          province of a jury.

24  *Wall v. County of Orange*, 364 F.3d 1107, 1110-1111 (9th Cir.

25  2004) (internal citations and quotations omitted).  In the second

26  step, the court must ask whether it would be clear to a

27  reasonable officer that his conduct was unlawful in the situation

28  confronted.  Although this inquiry is primarily a legal one,

**13**

where the reasonableness of the officer's belief that his conduct was lawful "depends on the resolution of disputed issues of fact...summary judgment is not appropriate." *Wilkins v. City of Oakland*, 364 F.3d 949, 1110-11 (9th. Cir. 2003) (citing *Saucier*, 533 U.S. at 216 (Ginsburg J., concurring).)

### C.   Civil Rights Claims Under 42 U.S.C. Section 1983

"Section 1983 provides for liability against any person acting under color of law who deprives another 'of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003)(quoting 42 U.S.C. § 1983). "The rights guaranteed by section 1983 are 'liberally and beneficently construed.'" *Id*. (quoting *Dennis v. Higgins*, 498 U.S. 439, 443 (1991). Pursuant to 42 U.S.C. § 1983, Plaintiff may bring a civil action for deprivation of rights under the following circumstances:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall

**14**

1      not be granted unless a declaratory decree was

2      violated or declaratory relief was unavailable. For

3      the purposes of this section, any Act of Congress

4      applicable exclusively to the District of Columbia

5      shall be considered to be a statute of the District

6      of Columbia.

7      **D.   The *Monell* Doctrine**

8  Local governments[1] are "persons" subject to suit for

9  "constitutional tort[s]" under 42 U.S.C. § 1983.[2]  *Haugen v.*

10 *Brosseau*, 339 F.3d 857, 874 (9th Cir. 2003) (citing *Monell v.*

11 *Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978)) (also

12 finding the fact that "local governments can be sued under § 1983

13 necessarily decides that local government officials sued in their

14 official capacities are "persons" under § 1983 in those cases in

15 which, as here, a local government would be suable in its own

16 name").  "[T]he legislative history of the Civil Rights Act of

17 1871 compels the conclusion that Congress did intend

---

[1] Although *Monell* dealt with a municipal government's
liability under § 1983, the standard there announced was
more broadly framed in terms of "a local government." *Brass
v. County of L.A.*, 328 F.3d 1192, 1198 (9th Cir. 2003).

[2] "There is certainly no constitutional impediment to
municipal liability.  'The Tenth Amendment's reservation of
nondelegated powers to the States is not implicated by a
federal-court judgment enforcing the express prohibitions of
unlawful state conduct enacted by the Fourteenth
Amendment.'"  *Monell*, 436 U.S. 691 (quoting *Milliken v.
Bradley*, 433 U.S. 267, 291 (1977)).  There is no "basis for
concluding that the Eleventh Amendment is a bar to municipal
liability." *Id.* (citing *Fitzpatrick v. Bitzer*, 427 U.S.
445, 456 (1976); *Lincoln County v. Luning*, 133 U.S. 529, 530
(1890)).

**15**

municipalities and other local government units to be included
among those persons to whom § 1983 applies." *Id.* at 690. "Local
governing bodies, therefore, can be sued directly under § 1983
for monetary, declaratory, or injunctive relief where, as here,
the action that is alleged to be unconstitutional, implements or
executes a policy statement, ordinance, regulation, or decision
officially adopted and promulgated by that body's officers...[or
for] deprivations visited pursuant to governmental 'custom' even
though such a custom has not received formal approval through the
body's official decision making channels."[3] *Id.* 690-91.

A local government's liability is limited.  Although a local
government can be held liable for its official policies or

---

[3] In *Brass v. County of Los Angeles*, the Ninth Circuit
followed evolution of municipal liability from *Monroe* to
*Monell*:

> In *Monroe v. Pape*, 365 U.S. 167 [](1961), the
> Supreme Court held that municipal corporations
> were not subject to liability under § 1983.  In
> *Monell*, 436 U.S. at 665, the Court, based upon
> its "fresh" review of the legislative history of
> the Civil Rights Act of 1871 (the statutory
> predecessor to § 1983), "overrule[d] *Monroe v.
> Pape*...insofar as it holds that local
> governments are wholly immune from suit under §
> 1983." *Id.* at 663 (footnote omitted).  The
> Court, however, upheld *Monroe* "insofar as it
> holds that the doctrine of respondeat superior
> is not a basis for rendering municipalities
> liable under § 1983 for the constitutional torts
> of their employees." *Id.* at 663 n.7. It stated
> that "the language of § 1983, read against the
> background of the same legislative history,
> compels the conclusion that Congress did not
> intend municipalities to be held liable unless
> action pursuant to official municipal policy of
> some nature caused a constitutional tort." *Id.*
> at 691.

*Brass*, 328 F.3d at 1198.

customs, it will not be held liable for an employee's actions
outside of the scope of these policies or customs.  "[T]he
language of § 1983, read against the background of the same
legislative history, compels the conclusion that Congress did not
intend municipalities to be held liable unless action pursuant to
official municipal policy of some nature caused a constitutional
tort.  In particular,...a municipality cannot be held liable
solely because it employs a tortfeasor. In other words, a
municipality cannot be held liable under § 1983 on a respondeat
superior theory." *Monell*, 436 U.S. at 691.  The statute's
"language plainly imposes liability on a government that, under
color of some official policy, [that] 'causes' an employee to
violate another's constitutional rights."  *Id*. at 692.
Therefore, "a local government may not be sued under § 1983 for
an injury inflicted solely by its employees or agents.  Instead,
it is when execution of a government's policy or custom, whether
made by its law-makers or by those whose edicts or acts may
fairly be said to represent official policy, inflicts the injury
that the government as an entity is responsible under § 1983."
*Id*. at 694.

###### E.   Suits Against Government Officials: Official Capacity and Individual Capacity Suits

Plaintiff brings suit against Defendants both in their
official and individual capacities.  "1983 claims against
government officials in their official capacities are really
suits against the governmental employer because the employer must
pay any damages awarded."  *Butler v. Elle*, 281 F.3d 1014, 1023
(9th Cir. 2002) (citing *Ky. v. Graham*, 473 U.S. 159, 165-66

**17**

1   (1985)); *see also Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d

2   836, 839 (9th Cir. 1997) (finding that "a suit against a state

3   official in his official capacity is no different from a suit

4   against the [official's office or the] State itself")(citing *Will*

5   *v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989).   In

6   such suits, the real party in interest is the entity for which

7   the official works.   *Hafer v. Melo,* 502 U.S. 21, 25 (1991).   A

8   federal action for monetary damages against an individual state

9   official acting in his official capacity is barred by the

10  Eleventh Amendment in the same way that an action against a State

11  is barred.   *Doe v. Lawrence Livermore Nat'l Lab.,* 131 F.3d 836,

12  839 (9th Cir. 1997).   "As the Supreme Court has stated,

13  'official-capacity suits...generally represent only another way

14  of pleading an action against an entity of which an officer is an

15  agent.'"   *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 524 n.3

16  (9th Cir. 1999) (quoting *Graham*, 473 U.S. at 165).   "'As long as

17  the government entity receives notice and an opportunity to

18  respond, an official-capacity suit is, in all respects other than

19  name, to be treated as a suit against the entity.'"   *Ruvalcaba*,

20  167 F.3d at 524 n.3 (quoting *Graham*, 473 U.S. at 166.)

21       By contrast, "[p]ersonal-capacity suits seek to impose

22  personal liability upon a government official for actions [taken]

23  under color of state law."   *Dittman v. California*, 191 F.3d 1020,

24  1027 (9th Cir. 1999)(*citing Kentucky v. Graham*, 473 U.S. 159, 165

25  (1985))(internal quotations omitted).   To establish personal

26  liability in a § 1983 or § 1985 action, it is enough to show that

27  the official, "acting under color of state law, caused the

28  deprivation of a federal right."   *Hafer,* 502 U.S. at 25 (internal

**18**

quotations omitted).  Public officials sued in their personal capacity may assert personal liability defenses, such as qualified immunity.  *Dittman,* 191 F.3d at 1027.

### 5. DISCUSSION

#### A.   Defendants' *Monell* Liability

To prevail on a § 1983 complaint against a local government under *Monell*, a plaintiff must satisfy a three-part test:  (1) The official(s) must have violated the plaintiff's constitutional rights;[4] (2) The violation must be a part of policy or custom and may not be an isolated incident; and (3) A nexus must link the specific policy or custom to the plaintiff's injury.  *See Monell*, 436 U.S. at 690-92.  There are three ways to show a policy or custom of a municipality:

> (1) By showing a longstanding practice or
>     custom which constitutes the standard
>     operating procedure of the local
>     government entity;
>
> (2) By showing that the decision-making
>     official was, as a matter of state law,
>     a final policymaking authority whose
>     edicts or acts may fairly be said to
>     represent official policy in the area of
>     decision or

_____

[4] "[A] public official is liable under § 1983 only if he causes the plaintiff to be subjected to deprivation of his constitutional rights.'" Brass, 328 F.3d at 1200 (quoting *Baker v. McCollan*, 443 U.S. 137, 142 (1979)(citation and internal quotation marks omitted)). "'Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Brass*, 328 F.3d at 1200 (quoting *Baker*, 443 U.S. at 146).

**19**

1    (3) By showing that an official with final
2       policymaking authority either delegated
3       that authority to, or ratified the
4       decision of, a subordinate.
5 *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005).
6 A municipal policy may be inferred from widespread practices or
7 evidence of repeated constitutional violations for which the
8 errant municipal officers were not discharged or reprimanded.
9 *Id.*

10   According to Defendants City of Oakdale Police Department
11 has never had a policy, practice or custom, written or otherwise,
12 authorizing or condoning unlawful seizures of persons including
13 the use of unlawful force in violation of the United States
14 Constitution.  Defendants' evidence establishes that the police
15 department has never had a policy of denying persons in custody
16 immediate medical attention nor has Plaintiff adduced any such
17 evidence.  In addition, the City does not have a custom, policy
18 and practice that encourages, tolerates, or ratifies the
19 employment, deployment, and retention of persons and peace
20 officers who search or seize persons in a unlawful manner.
21 Plaintiff points to no instances that support a finding of the
22 existence of such policy.

23   According to Defendants, prior to hiring of a police
24 officer, an extensive background investigation of applicants is
25 conducted pursuant to the P.O.S.T. standards, including a
26 psychological examination and evaluation.  The City requires
27 extensive and lawful training of police officers at certified
28 academies.

All Oakdale police officers attend P.O.S.T. certified academies which provide training that complies with the laws of the State of California and the standards set by the Commission on Peace Officer Standards and Training.  Once employed by the City of Oakdale, all sworn officers are required to complete at least 24 hours of P.O.S.T. certified training every 24 months.

Also, the Department regularly offers current P.O.S.T. courses as part of the on-going training provided to all employees.  Continuous in-house training is further provided, which includes law enforcement updates, as to the law provided by the Office of the local District Attorney, dissemination of the monthly training bulletins from the FBI and other legal updates from the California Peace Officers' Association, California Chiefs of Police Association and the International Chiefs of Police Association.

Defendants argue that as to Bailey's arrest, the City of Oakdale, by and through its police department, did not set in motion, a series of acts, or knowingly refuse to terminate a series of acts by others, which it knew or reasonably should have known or was plainly obvious, would cause others to inflict constitutional injury.

Plaintiff does not dispute that the City undertakes a number of measures to monitor and ensure that unlawful acts or other misconduct does not occur.  These measures include: a) review procedures when there is an allegation of misconduct; b) close monitoring, review and supervision of police officers; c) administrative inquiries; d) internal affairs investigations; e) citizen complaint procedures; f) disciplinary proceedings and

**21**

measures; g) extensive basic academy training and continuous in service training of officers; h) compliance with P.O.S.T. standards.  Plaintiff has provided no *Monell* evidence as to the City of Oakdale.  He has not identified prior similar instances where allegedly known medical needs of a suspect were ignored or where an injured suspect was required to exacerbate a known injury.

Defendants' Motion for Summary Judgement is **GRANTED** as to the City of Oakdale.

### B.   Qualified Immunity of the Oakdale Police Officers

Qualified immunity grows out of the policy concern that few individuals would enter public service if they risked personal liability for their official decisions.  *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).  The immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), and "spare[s] a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit."  *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Qualified immunity is not a defense on the merits; it is an "entitlement not to stand trial or face the burdens of litigation" that may be overcome only by a showing that (1) a constitutional right was in fact violated and (2) no reasonable officer could believe defendant's actions were lawful in the context of fact-specific, analogous precedents.  *Saucier v. Katz*, 533 U.S. 194, 200-202 (2001).

Plaintiff alleges that the individual Oakdale Police Officers violated his Fourth Amendment rights based on their

**22**

alleged use of excessive force during his arrest, by forcing to walk on his obviously injured leg.  Merging the Fourth Amendment standard with the qualified immunity presumption results in a two step inquiry in which Plaintiff must establish that (1) the officers in fact lacked probable cause to believe that there was a threat and (2) that it would have been clear to a reasonable officer, confronting the same circumstances, that the actions of the officers were unlawful.  *See Saucier,* 533 U.S. at 202.

### i.   A Dispute Exists as to Whether Defendants' Had Probable Cause to Require Bailey to Walk to the Ambulance

The initial question under *Saucier* is whether there was any type or amount of force inflicted on Bailey as a result of Defendants' response to his arrest without probable cause.

In his complaint, Bailey alleges that Defendants used excessive force in seizing and arresting him when they forced Bailey to stand on a severely dislocated knee, and forcing him to attempt to walk, then "dragging him approximately 100 yards to an ambulance." (Doc. 9, FAC, Filed February 7, 2005.)  Bailey further argues that as a proximate result of the officers' treatment of him during the arrest, Bailey's leg was amputated.

It is undisputed that immediately prior to his arrest, Bailey was voluntarily intoxicated and involved in a high risk, high speed motorcycle chase with the officers that he initiated. Bailey admits he consumed a number of alcoholic drinks in the span of two hours prior to operating his motorcycle.  Defendants argue that Bailey's blood alcohol level was .22, substantially above the legal limit.  Bailey claims that he does not have

**23**

sufficient information to determine the accuracy of that
statement at this time, although the case has been pending two
years.  It is undisputed that the chase came to an end when
Bailey abandoned his motorcycle and attempted to escape on foot.
This lawless and highly hazardous course of conduct set into
motion the events which caused Bailey's injury.  Bailey admits he
voluntarily jumped over a fence to evade arrest.  The six foot
fence had approximately a thirteen foot drop on the other side.
Upon landing, Bailey injured his knee and was unable to continue
running away.

     However, Bailey disputes the decisions Defendant Officers
made at the point after he was handcuffed and immobile.
Defendants argue that Bailey was not complaining of any pain and
that at no time did the Officers know or have reason to believe
the extent of Plaintiff's injuries beyond a common sprain.
Bailey asserts that he was visibly in pain, holding his knee
while laying on the ground prior to being handcuffed.  Bailey
also claims that he informed Officers that he was unable to walk.
Bailey states that he was screaming in pain as he was dragged
away towards the ambulance.  Bailey claims that the ambulance
could have been driven to where Plaintiff was located, but that
instead the Defendant Officers suggested the ambulance wait at
its location for the Officers to drag the Plaintiff to it.

     Dr. Blaisdell's testimony that Bailey's injury commonly
results in limb amputation is not dispositive.  Dr. Blaisdell did
not himself examine Bailey's injury and did not express his
medical opinion based on Plaintiff's version of the facts.  On
this record it is unknown what effect the Officers' allegedly

**24**

making Bailey walk towards the ambulance had, or whether bringing the ambulance to Bailey would have saved his leg.

Viewing the facts in the light most favorably to the non moving party, triable issues of fact arise as to whether Defendant Officers had probable cause to believe Bailey posed such a threat or as to how seriously he was injured, that it was necessary to escort him to the ambulance rather than have the ambulance drive to his location, where Bailey was handcuffed.

### ii.   Reasonableness

In determining the reasonableness of a seizure effected by non-deadly force, the nature and quality of the intrusion on the individual's Fourth Amendment interests is balanced against the countervailing government interests at stake. *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)(internal quotations omitted). The analysis proceeds in three steps. *Id.* First, an assessment is made into the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted. *Id.* Second, we assess the importance of the government interest at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* Third, the gravity of the intrusion on the individual is balanced against the government's need for the intrusion to determine whether it was constitutionally reasonable. *Id.*

In addition, consideration of reasonableness must embody allowance for the fact that police officers are often forced to

**25**

make split second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation. *Jackson v. City of Bremerton,* 268 F.3d 646, 651 (9th Cir. 2001). They are entitled to be mistaken if reasonable and in good faith.

It is undisputed that Bailey was driving under the influence of alcohol at excessive speeds, presenting a high risk to public safety. It is also undisputed that Bailey resisted arrest by fleeing from police to avoid arrest. When officers first approached Bailey he was laying on his stomach with his arms underneath him and his legs straight out. Bailey posed no immediate threat to the Officers at that time.

Defendants argue, that Officer Shimmel asked Bailey if he was hurt but Bailey's speech was slurred. When Officer Shimmel rolled Bailey over to pat him down, he could smell an odor of an alcoholic beverage on his breath. Officer Shimmel immediately called an ambulance to be dispatched to the officers' location because Bailey was not moving and he had complained of pain in his right leg. Bailey disputes these factual allegations.

Defendants further claim that Sergeant Semore inspected Bailey's leg with a flashlight at the scene. Bailey was wearing jeans and boots. Sergeant Semore could see no visible signs of injury such as swelling or blood through his jeans. Sergeant Semore asked Bailey if he could walk, but claims that Bailey did not answer him. Bailey disputes Defendants' version that Semore had to tell Bailey to focus and Bailey responded that he could walk.

Defendants also claim that Sergeant Semore ordered officers

**26**

1    to assist Bailey to the ambulance.  According to Defendants,

2    Bailey was helped up and was assisted to the fence area to meet

3    the ambulance and was transported to Oak Valley Hospital.

4    Defendants contend that Bailey was limping but was not

5    complaining of any pain.  While the officers were assisting

6    Bailey to the ambulance, Sergeant Semore walked behind him and

7    shined his flashlight on Bailey's legs and feet to again see if

8    there were any visible signs of injuries to his legs.  Sergeant

9    Semore did not see any visible signs to his legs but he did see

10   Bailey walking with a limp.  The officers claim to have been

11   bearing most of the weight while they were assisting Bailey.

12        Bailey, disputes Defendants' account.  Bailey states that he

13   was visibly in pain and that he did in fact inform the Officers

14   that he was in pain.  Bailey also claims that he screamed in pain

15   when escorted towards the ambulance.  Bailey maintains that there

16   was no need for the Officers to require him to walk towards the

17   ambulance while in such pain.  Bailey has offered evidence

18   through Shelly Thomas, the day custodian of Oakdale Junior High

19   School who declares that it was feasible for the gate to be

20   opened for an ambulance to be driven to the Plaintiff's location

21   on the night of the arrest.  Bailey also offers evidence from

22   Shawna Higgins, a retired locomotive engineer for Union Pacific

23   who heard the police phone call to the ambulance.  Higgins

24   recalls that the Officers deliberately instructed the ambulance

25   not to come towards the place of arrest and that they would bring

26   Bailey to the ambulance.  Accordingly, Bailey argues that

27   Defendants' conscious decision to escort him to the ambulance

28   rather than have the ambulance drive towards the scene was

**27**

1   unreasonable and with the intent to cause him to exacerbate his
2   injury.

3       Bailey offers the declaration of Mr. Kenny Wright who was a
4   witness to the incident.  (Doc. 73-2, Declaration of Kenny
5   Wright, Filed April 13, 2007.)  According to Mr. Wright Bailey
6   was screaming out in pain.  Whether the Officers were reasonably
7   mistaken that Bailey could walk, or they acted intentionally to
8   wantonly inflict pain is in dispute.  Whether Bailey's
9   intoxicated state justified the officers' actions and whether
10  Bailey was screaming is disputed.

11      Viewing the facts most favorably to Bailey, the non moving
12  party, a dispute exists as to whether Defendants' conduct was
13  reasonable in making Bailey walk to the ambulance after his
14  injury.

15      Defendants motion for summary judgment on Plaintiff's claim
16  for excessive force is **DENIED**.

17          **6.   PLAINTIFF'S MOTION FOR CONTINUANCE**

18      Rule 56(f) of the Federal Rules of Civil Procedure permits
19  the court, in the interests of justice, to grant a continuance to
20  allow further discovery or to deny summary judgment if it appears
21  from the affidavits of the party opposing the motion for summary
22  judgment that the party cannot present by affidavit facts
23  essential to justify the party's opposition.[5]  Where a party

24  ───────────────
        [5] The text of Rule 56(f) states:

25          Should it appear from the affidavits of a
26          party opposing the motion that the party
            cannot for reasons stated present by
27          affidavit facts essential to justify the
            party's opposition, the court may refuse the
28          application for judgment or may order a

                            **28**

believes that additional discovery is required to oppose a motion
for summary judgment, that party must submit an affidavit
pursuant to rule 56(f) stating what information will be obtained
and how that information will preclude summary judgment. *Barona*
*Group of the Capitan Grande Band of Mission Indians v. Amer. Mgt.*
*& Amusement, Inc.*, 840 F.2d 1394, 1400 (9th Cir. 1987).

To gain a continuance, the plaintiff must show the evidence
to be uncovered through further discovery is reasonably likely to
exist and adequate cause for not conducting discovery earlier.
*Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th  Cir.
1978).  A district court does not abuse its discretion by denying
a party's motion to reopen discovery where the party has failed
to comply with the requirements of Rule 56(f).  *Ashton-Tate Corp.*
*v. Ross*, 916 F.2d 516, 519 (9th Cir. 1990).

Bailey requests additional discovery for a short period of
time to depose his treating surgeon in order to determine the
condition of the artery at the time his leg was amputated.
Bailey argues that this information will further inform his
expert Doctor's expert opinion about the extent of arterial
damage from the fall and the likelihood that the delay in
immobilizing the knee and the impact of walking further damaged
the artery.  According to Bailey, even though his attorney
withdrew over a year ago, he did not sit idle.  Bailey argues
that he was diligent in continuing to use an investigator and
pursue witnesses.  Bailey claims that he was unable to secure an

---

continuance to permit affidavits to be
obtained or depositions to be taken or
discovery to be had or may make such other
order as is just.

1  attorney partly because his old attorney withheld his file for

2  six months.  Bailey has now secured an attorney.

3       Defendants oppose Bailey's request for a continuance.

4  Defendants argue that Bailey had ample time to diligently

5  prosecute this matter and failed to do so.  Defendants also claim

6  that Bailey should not be allowed to reopen discovery merely

7  because he has once again obtained counsel.

8       After the May 7, 2006 hearing on this matter, when new

9  counsel appeared and argued, Plaintiff's motion for continuance

10  was granted.  Discovery shall be reopened for 90 days to

11  facilitate the adjudication of Defendant's Motion for Summary

12  Judgment, pursuant to Rule 56(f).  Counsel for the parties shall

13  meet and confer in order to facilitate a discovery schedule and

14  complete depositions of percipient witnesses and expert witnesses

15  in order to specifically address the issues in Defendants'

16  Motion.

17              **7.  <u>RULE 36 ADMISSIONS</u>**

18       Bailey also requests that the court allow his responses to

19  requests for admissions to be served on Defendants.  Rule 36 of

20  the Federal Rules of Civil Procedure permits a party to "serve

21  upon any other party a written request for the admission... of

22  the truth of any matters within the scope of Rule 26(b)(1) set

23  forth in the request that relate to statements or opinions of

24  fact or the application of law to fact."  Fed. R. Civ. P. 36(a);

25  *Tillamook Country Smoker, Inc. v. Tillamook County Creamery*

26  *Ass'n*, 465 F.3d 1102, 1111 (9th Cir. 2006).  The effect of the

27  admission is such that "[a]ny matter admitted under this rule is

28  conclusively established" unless the court grants a motion to

1  waive or amend." *Id.* at 1111-1112. "As the district court

2  noted, the court and parties are bound by such admissions, which

3  cannot be 'ignored by the district court simply because it finds

4  the evidence presented by the party against whom the admission

5  operates more credible.'" *Id.* at 1112.

6      Defendants oppose Bailey's request to allow the admissions

7  to be served.  Defendants argue that Bailey failed to timely

8  serve his response to RFA's within the 30 days after he was

9  served with the request.  Requests for admissions were served on

10 Plaintiff on January 12, 2006 and his responses were due on

11 February 15, 2005.  Because of Bailey's failure to serve his

12 responses, Defendants argue that under Fed. R. Civ. P. 26(a)

13 Bailey's responses are admitted and are binding.  Defendants

14 claim that there is no reason to set the admissions aside because

15 Bailey has failed to provide evidence to the contrary and because

16 great prejudice will result to Defendants if the admissions do

17 not remain intact.

18     Bailey seeks relief under Fed. R. Civ. P. 36(b) and requests

19 that the court allow his responses to be served on Defendants.

20 Bailey claims that he was unable to provide responses because the

21 request for admissions was served six days after his attorney

22 withdrew as counsel of record, and the request for admissions was

23 served at Bailey's previous address at 1049 A Street, Oakdale,

24 California.  Bailey was no longer residing at this address when

25 the requests were served.  The requests for admissions undermine

26 every element of Bailey's claims and Bailey argues that it would

27 be unjust to allow the responses to be admitted.

28     To avoid prejudice from an errant mailing and to serve the

**31**

policy favoring trial on the merits, Plaintiff's motion for relief under Fed. R. Civ. P. 360(b) is **GRANTED.**   Defendants have not shown specific prejudice.

### 8. <u>CONCLUSION</u>

Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's *Monell* claim.

Defendants' motion for summary judgment on Bailey's Fourth Amendment claim is **DENIED.**

Plaintiff's motion for a continuance under Fed. R. Civ. P. 56(f) is **GRANTED.**

Plaintiff's motion for relief under Fed. R. Civ. P. 36(b) to not deem his responses to Plaintiff's request for admissions as failed is **GRANTED.**

Discovery has been extended and reopened for 90 days as specified by the Court's Order issued on May 16, 2007.

IT IS SO ORDERED.

**Dated:    June 18, 2007**                    ____/s/ Oliver W. Wanger____
                                              UNITED STATES DISTRICT JUDGE