1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK ANTHONY BAILEY,<br><br>                    Plaintiff,<br><br>     v.<br><br>OAKDALE POLICE DEPARTMENT, THE<br>CITY OF OAKDALE, OAKDALE<br>POLICE OFFICER BRIAN SHIMMEL,<br>individually and in his<br>official capacity, OAKDALE<br>POLICE OFFICER BRIAN SHIMMER,<br>individually and in his<br>official capacity, OAKDALE<br>POLICE OFFICER TAYLOR,<br>individually and in his<br>official capacity,<br><br>                    Defendants. | 1:05-CV-00113 OWW SMS<br><br>MEMORANDUM DECISION AND ORDER<br>GRANTING IN PART DENYING IN<br>PART DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT |

1.   INTRODUCTION

    This matter comes before the court on Defendants' motion for summary judgment to adjudicate Plaintiff Mark Anthony Bailey's ("Bailey" or "Plaintiff") § 1983 claims.  Bailey brings this action under 42 U.S.C. § 1983 alleging a pattern and practice of violation of civil rights by the Oakdale Police Department in violation of the Fourth and Fourteenth Amendments that allegedly resulted in the loss of his right leg.  The third hearing on Defendants' motion for summary judgment was held on January 7, 2007.

1

## 2. <u>PROCEDURAL BACKGROUND</u>

On February 7, 2005, Plaintiff filed a first amended complaint.  (Doc. 9, First Amended Complaint.)  On November 18, 2005, Plaintiff's attorney withdrew from the case.  (Doc. 37, Motion to Withdraw as Attorney.)  On December 13, 2006, Defendants filed a motion for summary judgment.  (Doc. 46, Motion for Summary Judgment.)  Plaintiff opposed the motion on February 12, 2007.  (Doc. 54, Opposition.)  Defendants filed their reply on February 20, 2007.  (Doc. 59, Reply.)

A hearing for this motion was scheduled on March 12, 2007.  At the hearing Mr. Bailey requested additional time to secure an attorney and obtain an expert witness.  Mr. Bailey was given thirty days to secure an attorney and file an opposition.  (Doc. 65, Minutes, Filed March 12, 2007.)

Bailey engaged an attorney and filed a second opposition on April 13, 2007.  (Doc. 71, Opposition II.)  On April 27, 2007 Defendants filed a reply to Bailey's second opposition.  (Doc. 77, Reply II.)  A second hearing on the motion was held on May 7, 2007.  An order was entered thereafter on June 19, 2007, granting Defendants' motion for summary judgment on Plaintiff's *Monell* claim and denying Defendants' motion for summary judgment on Plaintiff's Fourth Amendment excessive force claim.  (Doc. 83, Order.)  Discovery was reopened for 90 days to facilitate the adjudication of the remaining issues in Defendants' Motion for Summary Judgment, pursuant to Rule 56(f).  Both parties were permitted to submit supplemental pleadings on the remaining issues in Defendants' Motion for Summary Judgment: (1) whether there is a material issue of triable fact regarding causation for

2

Plaintiff's leg amputation; and (2) whether there is a material issue of triable fact as to Plaintiff's Fourteenth Amendment claim failure to provide known medical assistance/deliberate indifference to medical condition.  (Doc. 82, Order After Hearing.)  Plaintiff filed a supplemental opposition to Defendants' Motion for Summary Judgment on September 17, 2007. (Doc. 84, Supplemental Opposition.)  Defendants filed a third reply to Bailey's Supplemental Opposition on October 15, 2007. (Doc. 86, Reply III.)

### 3.  FACTUAL BACKGROUND

**A.   Disputed Facts**

   **i.    The Arrest**

On February 24, 2004, at approximately 8:30 p.m., Oakdale Police Officer Shimmel was dispatched to a hit and run call of a motorcycle hitting a fence.  (DSUF, No. 29.)  Officer Shimmel was about to make a call to the reporting party, when, while he was stopped at the intersection of Orsi Road and Sierra Road, he saw a motorcycle traveling at a high rate of speed.  (DSUF, No. 30.) Officer Shimmel activated his emergency lights as Bailey passed his patrol car.  (DSUF, No. 31.)  Bailey accelerated his motorcycle to evade the traffic stop.  (DSUF, No. 32.)  Officer Shimmel accelerated his patrol car to catch up with Bailey and turned northbound on View Point Avenue.  (DSUF, No. 33.)  Bailey again looked back at Officer Shimmel and accelerated at a high rate of speed causing the motorcycle to fishtail.  (DSUF, No. 34.)  Bailey then accelerated through the intersection of View Point and East "J" Street.  The intersection is controlled by stop signs.  (DSUF, No. 35.)

3

Officer Shimmel was on the radio with dispatch to notify them he was in pursuit when Bailey lost control of the motorcycle in the cul-de-sac at the end of View Point Avenue and Gold Rush Court.  (DSUF, No. 36.)  Officer Shimmel saw the motorcycle hit a parked car in front of a residence and then Bailey jumped up and took off running on foot leaving the motorcycle at the scene. (DSUF, No. 37.)  The address of the collision was 1414 Gold Rush Court.  (DSUF No. 38.)  Mr. Bailey jumped over a fence at this location to evade Officer Shimmel and to avoid arrest.  (DSUF No. 39.)

Officer Shimmel began to pursue Bailey on foot and eventually came to a fence that had a fifteen foot drop on the other side.  (DSUF, No. 40.)  Mr. Fowler, the owner of the parked car, advised Officer Shimmel that Bailey jumped the fence. (DSUF, No. 41.)  Robert Staves, the next door neighbor advised Officer Shimmel that Bailey was on the ground on the other side of the fence and it looked like he was hurt.  (DSUF, No. 42.) Mr. Staves had a flashlight on Bailey.  (DSUF, No. 43.)  Officer Shimmel notified dispatch of Bailey's location.  (DSUF, No. 44.) Officer Shimmel advised Mr. Staves and Mr. Fowler to get on the phone with the Oakdale Police Department and keep them informed of Mr. Bailey's actions.  (DSUF, No. 45.)  Officer Shimmel drove around the residential area to Cottles Wood Park and entered Oakdale Junior High School from the west side of the school. (DSUF, No. 46.)

Officer Taylor entered the school from the east side. (DSUF, No. 47.)  Officer Taylor ran through the walkway entrance because all the driveway entrances were locked up.  (DSUF, No.

4

13.)  When Officer Taylor first came upon Bailey, he was laying on his stomach with his arms underneath him and his legs straight out.  (DSUF, No. 17.)  Officer Taylor then took his gun and pointed it at Bailey while waiting for backup.  (DSUF, No. 18.)  A few moments later, Officer Shimmel, Sergeant Semore, Detective Savage and Detective Perez arrived.  (DSUF, No. 19.)

Officer Shimmel asked Bailey if he was hurt but claims Bailey's speech was slurred.  (DSUF, No. 48.)  When Officer Shimmel rolled Bailey over to pat him down, he could smell alcohol on his breath.  (DSUF, No. 49.)

Officer Shimmel immediately called for an ambulance to be dispatched to the Officers' location because Bailey was not moving and he had complained of pain in his right leg.  (DSUF, No. 50.)

At the hospital, Officer Shimmel had a nurse draw blood from Bailey for a blood alcohol test.  (DSUF, No. 51.)  Ultimately, Officer Shimmel was informed Bailey's blood alcohol was .22.  (DSUF, No. 52.)  While the nurse was drawing Bailey's blood, Officer Shimmel noticed that Bailey's right knee was swollen.  (DSUF, No. 53.)

Defendants argue that at the time an ambulance was requested Bailey was limping, but was not complaining of any pain.  (DSUF, No. 22.)  Defendants claim that at no time did the Officers know of, nor did they have reason to believe the extent of plaintiff's injury was anything other than a sprain or twist type injury.  (DSUF, No. 24.)  The Officers state that they did not believe nor did they have reason to believe the injury was serious.  (DSUF, No. 25.)

On the date of the incident, Sergeant Semore was in his patrol unit when he heard a call on the radio that officer Shimmel was in pursuit with a motorcycle.  (DSUF, No. 61.) Sergeant Semore could actually hear the motorcycle over the radio.  (DSUF, No. 62.)  Sergeant Semore drove towards the area of Cottles Wood Park.  (DSUF, No. 63.)  Sergeant Semore then exited his patrol unit and ran towards the pedestrian entrance. (DSUF, No. 64.)  Sergeant Semore asked officer Shimmel what was going on and officer Shimmel advised him that he had chased Mr. Bailey, that Mr. Bailey jumped over the fence, and that Mr. Bailey had injured his leg.  (DSUF, No. 66.)  Sergeant Semore could see no visible signs of injury such as swelling or blood through the jeans.  (DSUF, No. 69.)  Sergeant Semore asked Bailey if he could walk but claims Bailey did not answer.  (DSUF, No. 70.)  Because Bailey seemed very intoxicated, Sergeant Semore asserts he told Bailey to focus and Bailey responded that he could walk.  (DSUF, No. 71.)  Plaintiff disputes this and claims he told officers he could not walk.  (Doc. 72, Bailey Decl., Exhibit A, Bailey Depo., p. 67:21-24.)

According to Defendants, Sergeant Semore ordered Officers to assist Bailey to the ambulance.  (DSUF, No. 73.)  While the Officers were assisting Bailey to the ambulance, Sergeant Semore walked behind him and shined his flashlight on Bailey's legs and feet to again see if there were any visible signs of injuries to his legs.  (DSUF, No. 74.)  Sergeant Semore did not see any visible signs of injury to Bailey's legs but he did see Bailey walking with a limp.  (DSUF, No. 75.)  Defendants claim the

Officers supported Bailey's weight while they assisted him. (DSUF, No. 76.)

After the Officers walked about 1 to 20 yards while assisting Mr. Bailey and holding most of his weight so that it was not upon his leg, Sergeant Semore then took over for an officer and allegedly assisted Mr. Bailey to the ambulance. (DSUF, No. 77.)  Sergeant Semore only walked about 20-25 yards when he was relieved by Detective Perez.  (DSUF, No. 78.) Bailey disputes this and claims instead that he was dragged, screaming in pain, the length of a football field.  (Doc. 72, Bailey Depo., p. 62:21-64:8, 74:17-23.)

Sergeant Semore continued to walk with the Officers until they were through the entrance of the park area where Bailey was laid down.  (DSUF, No. 79.)  The ambulance arrived just as the Officers got to the entrance and Bailey was then transported by ambulance to Oak Valley Hospital.  (DSUF, No. 80.)

Prior to the police chase, Bailey was drinking white russians but does not remember how many.  (DSUF, No. 106.)  Mr. Bailey does not recall saying anything to the Officers.  (DSUF No. 122.)

ii.  Dr. Blaisdell

F. William Blaisdell, M.D. ("Dr. Blaisdell") is a professor of Surgery and Chair of Surgery at UC Davis School of Medicine. (DSUF, No. 126.)  Dr. Blaisdell's qualifications include Vascular Surgery.  (DSUF, No. 127.)  Dr. Blaisdell cannot provide the exact number of popliteal artery injuries he has seen.  He believes through a lifetime of practice, he has examined and treated more popliteal artery injuries than any surgeon in the

7

United States.  (DSUF, No. 129.)  Dr. Blaisdell has reviewed
Bailey's medical records.  These include the admitting and
discharge summary notes from Oakdale Hospital and Doctors'
Medical Center in Modesto as well as the x-rays and operative
notes.  (DSUF, No. 130.)  In addition to this, Dr. Blaisdell has
only relied on his own personal knowledge of this injury.  In
this regard, he can also state that this injury commonly results
in limb amputation, primarily in young, active men.  (DSUF, No.
131.)

        iii. Dr. Rossini

        Dr. Michael Rossini, Jr. ("Dr. Rossini") was a trauma
director at Doctor's Medical Center in Modesto at the time of
Plaintiff's injury.  (Doc. 84, Supplemental Opposition and PSUF,
p. 3:13-14.)  Dr. Rossini performed three surgeries on Plaintiff,
two artery grafts to attempt to salvage Plaintiff's right leg and
a third surgery to amputate the leg above the knee. (PSUF, p.
3:14-15.)  Dr. Rossini's duties include being an on-call trauma
surgeon and overseeing quality assurance of the emergency trauma
program. (PSUF, p. 3:16-17.)  Dr. Rossini, who performed three
surgeries on Plaintiff, including his leg amputation, testified
that first there was a knee injury, causing the knee to become
unstable and that secondarily caused the artery injury.  (PSUF,
p. 4:3-5.)  The knee instability caused by the fall caused some
damage to the popliteal artery.  (PSUF, p. 4: 14-16.)  There was
an intimal tear to the interior layers of the popliteal artery
causing thrombosis and complete impeding of blood flow.  (PSUF,
p. 4:17-20.)  If there is a partial dislocation of the knee, and
them some sort of twisting mechanism put on the knee, that could

have caused damage to the popliteal artery. (PSUF, p. 4:7-9.)

Whether having a dislocated knee and then being dragged, causing some torsion or twisting to an injured leg over some period of time could have caused further damage to Plaintiff's popliteal artery is hard to say.  There is no basis to opine when the actual artery disruption occurred.  (PSUF, p. 4:11-15.) After an injury fall, any twisting, bending, or subsequent motion or trauma is not beneficial and can only be categorized as potentially damaging but how much or what was done Dr. Rossini cannot say with any certainty.  (PSUF, p. 5:1-5.)  The dragging is not enough in and of itself.  (PSUF, p. 5:23-24.)  Dr. Rossini testified that whether Plaintiff's injury was made worse by dragging or whether it was continued by the dragging, is uncertain but he believes it was probably made worse.  However, it would depend on the manner in which Plaintiff was dragged. (PSUF, p. 5:9-11, 19-21.)

iv.  Dr. Bozic

Kevin M. Bozic, M.D. ("Dr. Bozic") is a physician, board certified in Orthopedic Surgery and employed as an Assistant Professor of Orthopaedic Surgery and an Attending Orthopaedic Surgeon at the University of California, San Francisco.  (Doc. 72, Gohel Decl., Exhibit F, Bozic Decl., ¶ 1.)  Dr. Bozic reviewed Plaintiff's medical records, the depositions in this case, the pre-hospital care report, witness statements and Dr. Blaisdell's declaration.  (Doc. 72, Bozic Decl., ¶ 2.)  Dr. Bozic's opinion, after reviewing Dr. Rossini's deposition testimony, is largely consistent with Dr. Rossini's.  (PSUF, p. 6:12-15.)  Dr. Bozic opines that the initial knee dislocation

9

occurred from the fall from the fence.  (PSUF, p. 6:15-16.)  Dr.
Bozic believes the proper procedure for the popliteal artery
injury, in order to salvage the leg, was to immobilize the leg
and move Plaintiff expeditiously to a Level I trauma facility.
(PSUF, p. 6:16-19).  Being dragged or forced to walk 100 yards
could have been a factor contributing to further damage to
Plaintiff's popliteal artery injury.  (PSUF, p. 6:22-24.)  Dr.
Bozic opines that it is unlikely that Plaintiff could have walked
or bore weight on his leg for 100 yards, and if he did, he would
have suffered severe pain.  (PSUF, p. 6:24-25.)

**B.    Undisputed Facts**

Upon arrival at the scene, Sergeant Semore looked at
Bailey's leg with a flashlight.  (DSUF, No. 67.)  Bailey was
wearing jeans and boots.  (DSUF, No. 68.)

It was determined that Bailey required emergency surgery for
internal bleeding on his right leg.  (DSUF, No. 54.)  Bailey was
transported to Doctors Medical Center in Modesto for surgery.
(DSUF, No. 55.)

Mr. Bailey has been convicted of felonies.  (DSUF. No. 100.)
Mr. Bailey has been convicted for Marijuana possession and
transportation of Methamphetamine.  (DSUF. No. 101.)  He was
convicted in 1999.  (DSUF. No. 102.)

On the night of the incident, Mr. Bailey had a number of
alcohol drinks, white russians, at a place called Whiskey River.
(DSUF. No. 103.)  Mr. Bailey arrived at the Whiskey River at
about 5:00 p.m.  (DSUF. No. 104.)  Mr. Bailey left the bar at
about 7:30 p.m.  (DSUF. No. 105.)  When Mr. Bailey got home his
girlfriend was physically and verbally angry at him for being

late.   (DSUF. No. 107.)   Mr. Bailey left on his motorcycle.
(DSUF. No. 108.)   Mr. Bailey was driving, missed a turn, and went
up on the curb.   (DSUF. No. 109.)   He then turned on to Orsi and
went down Sierra Street.   (DSUF. No. 110.)   Mr. Bailey was not
sure he was going over the speed limit.   (DSUF. No. 111.)

        Mr. Bailey saw a patrol car, got scared because he thought
he might be arrested.   (DSUF. No. 112.)   He knew the police were
following him and wanted him to pull over.   He saw that the
police car lights were activated.   (DSUF. No. 113.)   So he parked
his motorcycle and ran because he was scared.   (DSUF. No. 114.)
Mr. Bailey then jumped a fence and ran in someone's backyard.
(DSUF, No. 115.)   He then jumped another fence and hurt his knee.
(DSUF. No. 116.)   He estimates that the fence was six foot on the
side he jumped from and 12 to 13 foot drop on the other side.
(DSUF. No. 117.)   He could not run anywhere.   So, he in effect
gave up at that point.   (DSUF. No. 118.)   The police came.
(DSUF. No. 120.)   He was handcuffed.   (DSUF. No. 121.)   He does
not recall which Officers took him to the ambulance.   (DSUF. No.
123.)   Once Mr. Bailey passed through the gate, he was placed on
a gurney and then put into the ambulance.   (DSUF. No. 124.)   His
knee hurt.   It felt like it was sprained and twisted.   He did not
think it was broken.   (DSUF. No. 125.)

### 4.   LEGAL BACKGROUND

A.    Summary Judgment Standard

        Summary judgment is warranted only "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact." Fed. R. Civ. P. 56(c);

*California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).
Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material. *Id*.  A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  Facts are "material" if they "might affect the outcome of the suit under the governing law." *Campbell*, 138 F.3d at 782 (quoting *Anderson*, 477 U.S. at 248).

The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment. *See United States ex rel. Anderson v. N. Telecom, Inc.*,

12

52 F.3d 810, 815 (9th Cir. 1995).  **Nevertheless, the evidence**

**must be viewed in a light most favorable to the nonmoving party.**

*Anderson*, 477 U.S. at 255.  **A court's role on summary judgment is**

**not to weigh evidence or resolve issues; rather, it is to**

**determine whether there is a genuine issue for trial. *See***

*Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir. 1996).

**B.   Summary Judgment in a Qualified Immunity Case**

     **In this case, Defendants assert the defense of qualified**

**immunity on behalf of all the individual defendants.  Deciding**

**qualified immunity entails a two-step analysis.  First, a court**

**must ask whether a constitutional violation occurred at all.  If**

**the answer to this question is yes, the court must then inquire**

**whether the right violated was "clearly established" by asking**

**whether a reasonable officer could believe that the defendant's**

**actions were lawful. *See Saucier v. Katz*, 533 U.S. 194, 201**

**(2001).**

     **The traditional summary judgment approach should be used in**

**analyzing the first step of the *Saucier* analysis:**

> **A court required to rule upon the qualified immunity
> issue must consider, then, this threshold question:
> Taken in the light most favorable to the party
> asserting the injury, do the facts alleged show the
> officer's conduct violated a constitutional right?
> Where the facts are disputed, their resolution and
> determinations of credibility are manifestly the
> province of a jury.**

*Wall v. County of Orange*, 364 F.3d 1107, 1110-1111 (9th Cir.

2004) (internal citations and quotations omitted)*.*  **In the second**

**step, the court must ask whether it would be clear to a**

**reasonable officer that his conduct was unlawful in the situation**

**confronted.  Although this inquiry is primarily a legal one,**

where the reasonableness of the officer's belief that his conduct was lawful "depends on the resolution of disputed issues of fact...summary judgment is not appropriate." *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th. Cir. 2003) (citing *Saucier*, 533 U.S. at 216 (Ginsburg J., concurring).)

C.   Civil Rights Claims Under 42 U.S.C. Section 1983

       "Section 1983 provides for liability against any person acting under color of law who deprives another 'of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003)(quoting 42 U.S.C. § 1983).  "The rights guaranteed by section 1983 are 'liberally and beneficently construed.'" *Id.* (quoting *Dennis v. Higgins*, 498 U.S. 439, 443 (1991).  Pursuant to 42 U.S.C. § 1983, Plaintiff may bring a civil action for deprivation of rights under the following circumstances:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

       To establish personal liability in a § 1983 action, it is enough to show that the official, "acting under color of state

law, caused the deprivation of a federal right." *Hafer v. Melo,* 502 U.S. 21, 25 (1991) (internal quotations omitted).  Public officials sued in their personal capacity may assert personal liability defenses, such as qualified immunity. *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999).

### 5.  DISCUSSION

**A.  § 1983 Fourth Amendment Excessive Force Claim: Causation of Leg Amputation**

Plaintiff alleges that the individual Oakdale Police Officers violated his Fourth Amendment rights and brings a § 1983 excessive force suit claiming their actions were a "substantial factor" in causing the amputation of his injured right leg.

In the Court's previous Summary Judgment Order, Defendants motion for summary judgment on Plaintiff's Fourth Amendment excessive force claim was denied.  The issue of whether the proximate result of the Officers' treatment of Plaintiff during the arrest resulted in Bailey's leg amputation remained and is addressed here. (Doc. 83, Order.)

The California Supreme Court has noted a preference for the use of the term "legal" causation rather than "proximate" causation, *see Mitchell v. Gonzales*, 819 P.2d 872, 879 (1991), however, either way California courts incorporate the substantial factor test into the causation analysis. *Ileto v. Glock Inc.*, 349 F.3d 1191, 1206 (9th Cir. 2003)  "California has definitely adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations." *Rutherford v. Owens-Illinois*, 941 P.2d 1203, 1214 (1997)

It is undisputed that immediately prior to his arrest,

15

Bailey was voluntarily intoxicated and involved in a high risk, high speed motorcycle chase with the Officers that he initiated. Bailey admits he consumed a number of alcoholic drinks in the span of two hours prior to operating his motorcycle.  Defendants argue that Bailey's blood alcohol level was .22, substantially above the legal limit.  It is undisputed that the chase came to an end when Bailey abandoned his motorcycle and attempted to escape on foot.  This lawless and highly hazardous course of conduct set into motion the events which caused Bailey's injury. Bailey admits he voluntarily jumped over a fence to evade arrest. The six foot fence had approximately a thirteen foot drop on the other side.  Upon landing, Bailey injured his knee and was unable to continue his flight.

Plaintiff's testified in his deposition that Defendants dragged him the length of a football field to meet the ambulance while he was screaming in pain and thus this was a substantial factor in causing his leg amputation.

Proximate cause "limits the defendant's liability to those foreseeable consequences that the defendant's negligence was a substantial factor in producing." *Mendoza v. City of Los Angeles*, 66 Cal.App.4th 1333, 1342, 78 Cal.Rptr.2d 525, 530 (1998). "Whether an act is the proximate cause of injury is generally a question of fact; it 'is a question of law where the facts are uncontroverted and only one deduction or inference may reasonably be drawn from those facts.'" *Ileto*, 349 F.3d at 1206 (quoting *Garman v. Magic Chef, Inc.*, 117 Cal.App.3d 634, 638, 173 Cal.Rptr. 20, 22 (1981)).

Plaintiff also submitted deposition testimony of trauma

surgeon Dr. Rossini, trauma director at Doctor's Medical Center in Modesto who performed three surgeries on Plaintiff, two artery grafts to attempt to salvage Plaintiff's leg and a third to ultimately amputate the leg.  In his deposition, Dr. Rossini testified that Plaintiff first dislocated his knee from his fall, which caused his knee to become unstable and this caused the secondary right popliteal artery injury or the artery fracture. (Doc. 85, Gohel Decl. II, Exhibit A, Rossini Depo., p. 36:13-37:4.)  Dr. Rossini testified that there are two types of pain, the first associated with the dislocation of the knee and the second from the artery injury. (Doc. 85, Rossini Depo., p. 74:1-19.)  In the same area behind the knee where the artery injury occurred, Plaintiff also had a frayed nerve indicating Plaintiff had either "stretching, extension, flexion of the extremity." (Doc. 85, Rossini Depo., p. 47:9-13.)  Dr. Rossini, however is unable to discern the mechanism which caused the physical injury. (Doc. 85, Rossini Depo., p. 47:12-14.)

Dr. Rossini testified: "Probably, and again in my opinion, he had an injury there.  Whether it was made worse by the dragging or whether it was continued by the dragging, I can't say, but probably so."  However, "[t]he dragging is not enough in and of itself." (Doc. 85, Rossini Depo., p. 79:2-11.)

Plaintiff also has submitted two declarations by Dr. Kevin Bozic, a physician, board certified in Orthopedic Surgery, employed as a Professor of Orthopedic Surgery and an Attending Orthopaedic Surgeon at the University of California, San Francisco.  In Dr. Bozic's supplemental declaration, he reviewed Dr. Rossini's deposition and states that his own opinion is

17

consistent with Dr. Rossini's.  "I am of the opinion that it is likely that Mr. Bailey dislocated his right knee when he jumped or fell from the fence into the schoolyard.  I am also of the opinion that the initial injury to his popliteal artery was likely a result of the fall." (Doc. 85, Gohel Decl. II, Exhibit B, Bozic Suppl. Decl., ¶ 3.)  "If Mr. Bailey had suffered an intimal tear of the popliteal artery, and then he had walked, been dragged for some considerable distance such as 100 yards, this could have been a factor which contributed to further damage to the artery." (Doc. 85, Bozic Suppl. Decl., ¶ 6.)

Defendants' submit contrary expert testimony of Dr. Blaisdell, Professor of Surgery and Chair of Surgery Eritus at UC Davis School of Medicine, board certified in Vascular Surgery. Dr. Blaisdell claims he has treated more popliteal artery injuries than any surgeon in the United States.  After reviewing Plaintiff's medical records pertaining to the popliteal artery injury and the depositions of Officers Schimmel, Taylor, Savage, Perez, Crozier and Semore, as well as depositions of Paramedics Colleen Martinez, EMT Allen Berghorst, Dr. Michael Rossini, Alan Stevenson, Bailey and Dr. Bozic's declaration, Dr. Blaisdell is of the opinion that this type of injury commonly results in limb amputation. (Doc. 87, Hamilton Decl., Exhibit A, Blaisdell Decl., ¶ 3.)  In contrast to Plaintiff's experts he states: "I can say with all reasonable certainty that the Officers' management of Mr. Bailey had nothing whatsoever to do with causing his injury or the amputation of his leg, whether he was dragged, walked or whether he had been evacuated by stretcher (waiting for the latter would only have delayed the operation even longer)." (Doc.

87, Blaisdell Decl., ¶ 12.)  Dr. Baisdell opines that Plaintiff's allegations that his leg was badly twisted during the police transport from the site of the injury to the ambulance did not result in the blockage of the artery, "[i]t was the blockage of the artery, the lack of blood flow to Mr Bailey's lower leg, and the time that elapsed between the blockage and treatment for that blockage that ultimately led to the amputation of Mr. Bailey's leg." (Doc. 87, Blaisdell Decl., ¶ 11.)

"Undue emphasis should not be placed on the term 'substantial.'" *Rutherford v. Owens-Illinois*, 941 P.2d 1203, 1214 (1997).  "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.  A standard instruction (BAJI No. 3.77) tells juries that each of several actors of forces acting concurrently to cause an injury is a legal cause of the injury, 'regardless of the extent to which each contributes to the injury.'" *Id.* at 1220.

Plaintiff argues that if Defendant Officers had left Plaintiff at the site of the fall and had the ambulance or the gurney come to the location of the fall and immobilized Plaintiff's leg, it could be determined whether the popliteal artery was damaged enough at that point to cause the thrombosis and the ultimate loss of Plaintiff's right leg.  Plaintiff contends that Defendants' conduct in failing to leave Plaintiff at the site of the accident, exacerbating his unstable knee condition by dragging Plaintiff over a significant distance "now makes it impossible to determine the mechanism that caused the ultimate thrombosis and subsequent amputation."  Plaintiff

19

asserts there is reason to believe that it is more likely than not that the Defendant Officers' actions were a substantial factor in causing arterial damage which resulted in his leg amputation.  Plaintiff suggests that it is impossible to determine with 100% certainty whether Plaintiff's fall was the only substantial factor causing the leg amputation.

Viewing the facts in the light most favorably to the non moving party, there are triable issues of fact whether Defendant Officers' actions were a "substantial factor" in causing the amputation of Plaintiff's leg.

Defendants' motion for summary judgment on the cause of Plaintiff's injury pursuant to his § 1983 Fourth Amendment excessive form claim is DENIED.

**B.   Qualified Immunity of the Oakdale Police Officers in a §
      1983 Fourteenth Amendment Deliberate Indifference to Medical
      Needs Claim**

Qualified immunity grows out of the policy concern that few individuals would enter public service if they risked personal liability for their official decisions. *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).  The immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotations and internal citations omitted), and "spare[s] a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).  Qualified immunity is not a defense on the merits; it is an "entitlement not to stand trial or face the burdens of litigation," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), that may be overcome only by a showing that (1)

20

a constitutional right was in fact violated and (2) no reasonable officer could believe defendants' actions were lawful in the context of fact-specific, analogous precedents. *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001).

Plaintiff brings a § 1983 action and alleges that the individual Oakdale Police Officers violated his Fourteenth Amendment right to medical treatment by their intentional and deliberate indifference to Plaintiff's obvious severe medical condition by knowing he was injured and in pain and failing to call the ambulance to his location, dragging him instead over 120 yards to meet the ambulance while in allegedly obvious extraordinary pain.

Merging the Fourteenth Amendment standard with the qualified immunity presumption results in a two step inquiry under which Plaintiff must establish that (1) Defendant Officers were deliberately indifferent to the medical needs of Plaintiff and (2) that it would have been clear to a reasonable officer, confronting the same circumstances, that the actions of the officers were unlawful. *See Saucier,* 533 U.S. at 201-202.

> i.   A Dispute Exists as to Whether Defendants' Failed to Summon Medical Care in Deliberate Indifference by "Dragging" and/or Assisting Bailey to Walk to the Ambulance

The Fourteenth Amendment due process clause requires government officials to secure medical care for persons injured in police custody. *Maddox v. Los Angeles,* 792 F.2d 1408, 1414-15 (9th Cir. 1986) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). "The Court has recognized that deliberate indifference is egregious enough to state a substantive due

21

process claim in one context, that of deliberate indifference to the medical needs to pretrial detainees..." *Sacramento v. Lewis,* 523 U.S. 833, 834 (1998).  Although Bailey's claim arises under the Fourteenth Amendment due process clause, "the eighth amendment guarantees provide a minimum standard of care for determining ... rights as a pretrial detainee, including ... right to medical care." *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986) (citing *City of Revere*, 463 U.S. at 244).  A police officer's constitutional duty can be fulfilled "by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Maddox*, 792 F.2d at 1415 (citing *Revere*, 463 U.S. at 245); *see also Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) (an individual was moved by police officers from his front porch into his locked house, then the police officers canceled the prior 911 call for medical assistance despite the belief that the individual required urgent medical care.  The individual died in the house without receiving medical assistance. Section 1983 claim against the officers was viable, given the officers' affirmative acts in placing the individual in mortal danger); *Jones*, 781 F.2d at 771 (Fourteenth Amendment claim of extreme discomfort and pain suffered by an inmate due to a delay in surgery sufficient for a serious medical need claim).

The standard used to determine whether denial of medical care to a detainee rises to a constitutional level is that of deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Plaintiff must provide evidence that Defendant Officers exhibited deliberate indifference to his serious medical needs.

*Jones*, 781 F.2d at 771.   Plaintiff must provide evidence that the Officers actually knew of and disregarded a substantial risk of serious harm to his health and safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (defining deliberate indifference).   "A determination of 'deliberate indifference' involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin,* 974 F.2d 1050, 1060 (9th Cir. 1992) *overruled on other grounds*.   "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment. *Id.*

Deliberate indifference involves an official knowing of and disregarding an excessive risk to inmate health or safety; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; see *Bryan County v. Brown*, 520 U.S. 397, 410 (1997) ("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions.").   "The Supreme Court has stated that negligence, whether gross or simple, is insufficient to prove a constitutional violation." *Kennedy v. City of Ridgefield*, 440 F.3d 1091, 1093-94 (9th Cir. 2006); *see also Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause is simply not implicated by a negligent act of an official

23

causing unintended loss of or injury to life, liberty, or property.")

Plaintiff submits evidence that if believed is as follows: (1) he told Defendant Officers he could not walk (Doc. 85, Bailey Decl., Exhibit A, Bailey Depo., p. 53:4-54:10.); (2) Officers in response told him he could walk and took turns "dragging" him (he did not walk since one of his legs could not move) the length of a football field to the ambulance (Doc. 85, Bailey Depo., p. 54:12-56:4.); (3) Plaintiff testified that he was screaming in pain during the time he was dragged by the Officers (Doc. 85, Bailey Depo., p. 56:13-57:6) and felt a twisting when he was dragged which caused him extreme pain. (Doc. 85, Bailey Depo., p. 62:21-64:8.)  Plaintiff submits Paramedic Colleen Martinez's deposition testimony.  Ms. Martinez who responded to the 911 call states "He seemed irrational with pain.  He was screaming and also incoherent and extremely uncooperative." (Doc. 85, Gohel Decl. II, Exhibit C, Martinez Depo., p. 27:18-23.)

Plaintiff also submits deposition testimony of eyewitness Alan Stevenson.  While Mr. Stevenson can no longer fully verify his statements made to Plaintiff's private investigator Gary Ermoian (shortly after the incident) in which he stated he heard Plaintiff scream in pain while being dragged, in his deposition testimony (of July 2007) Mr Stevenson testified that he heard Plaintiff yelling when he was being carried, and the yelling was either out of pain or anger. (Doc. 85, Gohel Decl. II, Exhibit D, Stevenson Depo., p. 29:9-30:15.)  Bailey offers as further evidence, the declaration of Kenny Wright who was a witness to the incident. (Doc. 73, Ermoian Decl., Exhibit A,  Wright Decl.)

According to Mr. Wright, Bailey was screaming out in pain at the scene where Plaintiff fell. (Doc. 73. Wright Decl.)

And finally (4) Defendant Officers could have easily summoned an ambulance or gurney to the location where Plaintiff fell, but chose not to, despite easy access.  Witness Shawna Higgins[1] testified in her deposition that she heard an officer request an ambulance to the location of the fall and then a few seconds later, another officer cancelled that request and stated they would bring the suspect to the ambulance. (Doc. 85, Gohel Decl. II, Exhibit D, Higgins Depo., p. 10:4-12:58.)  Bailey also offers evidence through Shelly Thomas, the day custodian of Oakdale Junior High School, that it was feasible for the gate to be opened for an ambulance to be driven to the location where Plaintiff fell on the night of the arrest.

Bailey contends that Defendants' conscious decision to escort him to the ambulance rather than to have the ambulance drive to Plaintiff's location was unreasonable and is an inference in his favor that they intended to cause Plaintiff unnecessary pain and to exacerbate his injury.  Paramedic Colleen Martinez confirmed in her deposition that the ambulance at the scene of the accident was equipped with a gurney that could be folded up and down and taken to the site of the fall, if requested by police officers. (Doc. 85, Martinez Depo., p. 35:13-19, p. 36:13-21.).

Defendant Officers however, state that they did not know of

_____

[1] Ms. Higgins is a retired locomotive engineer for Union Pacific Railroad, and a police scanner enthusiast. (Doc. 85, Higgins Depo., p. 7:14-28, p. 8:7-9:24.)

the seriousness of Plaintiff's injury.  Officer Brian Schimmel
and Sergeant Darren Semore who both were present at the scene of
the accident, testified in their depositions that they asked
Plaintiff if he could walk or was hurt but Plaintiff either did
not respond or Plaintiff responded with slurred speech. (Doc. 49,
Schimmel Decl., Exhibit B, ¶ 8 and Semore Decl., Exhibit C, ¶ 9.)
Sergeant Semore testified that he then asked Plaintiff again if
he could walk and Plaintiff, visibly intoxicated, responded
affirmatively. (Doc. 49, Semore Decl., ¶ 9.)  Officer Schimmel,
Officer Dan Taylor and Sergeant Semore all testified that they
did not know of or have reason to believe the extent of
Plaintiff's injury was anything other than a sprain or twist type
injury nor did they have reason to believe the injury was so
serious Plaintiff could not walk. (Doc. 49, Taylor Decl., Exhibit
A, ¶ 10, Schimmel Decl., ¶ 10, Semore Decl., ¶ 12.)

        Officer Shimmel claims he immediately called an ambulance
to be dispatched to the Officers' location because Bailey was not
moving and he had complained of pain in his right leg.  Bailey
disputes these factual allegations.  Defendants further claim
that Sergeant Semore inspected Bailey's leg with a flashlight at
the scene.  Bailey was wearing jeans and boots.  Sergeant Semore
could see no visible signs of injury such as swelling or blood
through the jeans.  Sergeant Semore alleges he asked Bailey if he
could walk and Bailey did not answer him, but Bailey disputes
Defendants' version that Semore had to tell Bailey to focus and
Bailey responded that he could walk.

        Defendants also claim that Sergeant Semore ordered Officers
to assist Bailey to the ambulance.  According to Defendants,

Bailey was helped up and was assisted to the fence area to meet the ambulance and was transported to Oak Valley Hospital. Defendants contend that Bailey was limping but was *not* complaining of any pain.

While the Officers were assisting Bailey to the ambulance, Sergeant Semore states that he walked behind Plaintiff and again shined his flashlight on Bailey's legs and feet to look for any visible signs of injuries to Plaintiff's legs. Sergeant Semore did not see any visible signs of injuries to Plaintiff's legs but he did see Bailey walking with a limp. The Defendant Officers also claim, contrary to Bailey's version, that they bore most of his weight while they were assisting Bailey.

Defendant Officers also argue that EMT Berghorst and Paramedic Martinez were also not able to identify the seriousness of Plaintiff's injury. In addition they cite to evidence that Dr. Berliner, the treating physician at Oak Valley Hospital took two hours to diagnose Plaintiff's condition and that Dr. Rossini stated that a dislocated or sprained knee rarely has aterial damage. (Doc. 85, Rossini Depo., p. 75:9-25.).

Bailey rejoins however, that he was visibly in pain and that he did in fact inform the Officers that he was in pain. Bailey also claims that he screamed in pain when escorted towards the ambulance. Bailey maintains that there was no need for the Officers to require him to walk towards the ambulance while he was in such pain.

Plaintiff's evidence raises a triable issue of fact whether Defendant Officers were deliberately indifferent to Plaintiff's serious medical needs and intended to inflict pain and suffering

to an obviously injured suspect based on their knowledge of his fall and exclamation of pain, all of which is disputed.  The inferences from the evidence submitted must be drawn in Plaintiff's favor.  If Plaintiff's testimony is believed, Defendant Officers ignored Plaintiff's statements that he was hurt and could not walk, Defendant Officers dragged, and did not assist Plaintiff by bearing his full weight in taking Plaintiff to the ambulance.  Defendant Officers heard Plaintiff screaming in pain while he was taken to the ambulance, when the ambulance or in the alternative a gurney was available to pick Plaintiff up at the accident site.  The dragging or walking could cause flexion or torsion to the knee to exacerbate the injury.  A deliberate indifference to a plaintiff's medical claim could be found.  "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." *McGuckin*, 974 F.2d at 1060.  Whether the Defendant Officers were "deliberately" indifferent in a "substantial" way, *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986), and whether it was clear to the Defendant Officers that Plaintiff suffered from a "serious medical need," *Id.*, is disputed, whether Bailey's intoxicated state justified the Defendant Officers' actions and whether Bailey was screaming in pain is also disputed.

Defendants' motion for summary judgment on Plaintiff's § 1983 Fourteenth Amendment deliberate indifference to medical care claim is DENIED.

ii. Qualified Immunity

"In order to be entitled to qualified immunity, the officers

must show that their discretionary conduct did not violate any clearly established right of which a reasonable person should have known." *Penilla v. City of Huntington Park,* 115 F.3d 707, 709 (9th Cir. 1997).  "Summary judgment on qualified immunity is not proper unless the evidence permits only one reasonable conclusion.  Where 'conflicting inferences may be drawn from the facts, the case must go to the jury.'" *Munger v. City of Glasgow Police Dept.*, 227 F.3d 1082, 1087 (9th Cir. 2000)(quoting *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000)). Defendant Officers have the burden to show that "'a reasonable officer could have believed, in light of the settled law, that he was not violating a constitutional or statutory right.'" *Id.* (quoting *Collins v. Jordan*, 110 F.3d 1363, 1369 (9th Cir. 1996)). Plaintiffs cite to no case law on this issue.  Defendants cite only to case law that establishes that peace officers have no duty to administer CPR. *See Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244-45 (1983) ("The Due Process Clause...require[s] the responsible government...agency to provide medical care to persons...who have been wounded while being apprehended by the police...We need not define, in this case [the city's] due process obligation to pretrial detainees or to other persons in its care who require medical attention.  Whatever the standard may be, [the city] fulfilled its constitutional obligation by seeing that [the arrestee] was taken promptly to a hospital that provided the treatment necessary for his injury.")  Defendants argue that the actions taken by Officers, even if mistaken, were reasonable.

There is no dispute that Officers summoned an ambulance to

1  address Plaintiff's injury from his fall in order to receive

2  medical attention.  Defendant Officers also argue there has been

3  no demonstration of malice or ill-will on the part of the

4  Defendant Officers and claim that no reasonable person would

5  believe that Plaintiff would ultimately lose his leg.  Defendants

6  claim they acted reasonably in the face of dealing with a highly

7  combative and intoxicated individual.  "If the right is clearly

8  established, the court must determine whether the defendant's

9  conduct was 'objectively legally reasonable' given the

10 information possessed by the defendant at the time of his or her

11 conduct." *Lawrence v. U.S.*, 340 F.3d 952, 955 (9th Cir.

12 2003)(citing *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)).

13 "[Q]ualified immunity shields agents... if 'a reasonable officer

14 could have believed [the action] to be lawful, in light of

15 clearly established law and the information the [arresting]

16 officer possessed.'" *Hunter v. Bryant*, 502 U.S. 224, 227

17 (1991)(quoting *Anderson*, 483 U.S. at 641.)

18      Nevertheless, the evidence must be viewed in a light most

19 favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

20 Plaintiff's testimony that he was screaming in pain while being

21 dragged to the ambulance and was limping and screaming in pain,

22 not anger, while being dragged a football field length in

23 distance, should alert a reasonable police officer that Plaintiff

24 has suffered a severe injury that required immediate medical

25 assistance and that Plaintiff should have been immobilized and

26 not moved until medical personnel could assess the damage.  Due

27 to Plaintiff's outrageous and unlawful conduct, the Defendant

28 Officers, if Plaintiff's evidence is believed, could have been

1   irritated or angry with Plaintiff and their treatment of him as

2   alleged could have manifested a hostile or vengeful state of mind

3   toward Plaintiff based on his grossly reckless conduct in

4   engaging in a high speed chase.  If all Plaintiff's evidence is

5   believed, a reasonable officer would not have moved Plaintiff

6   from the point of his fall or would have immobilized him and

7   taken Plaintiff on a gurney or summoned the ambulance to

8   Plaintiff's location.  No reasonable officer would intentionally

9   inflict plain or exacerbate a known injury to an injured suspect.

10  The duty not to do so is clearly established.

11      Defendants' motion for summary judgment on Plaintiff's §

12  1983 Fourteenth Amendment deliberate indifference to medical care

13  needs on qualified immunity grounds is DENIED.

14

15                      **6.   CONCLUSION**

16          Defendants' motion for summary judgment on failure of

17  Bailey to provide evidence of proximate cause under his § 1983

18  Fourth Amendment claim is DENIED.

19      Defendants' motion for summary judgment on Bailey's § 1983

20  Fourteenth Amendment medical treatment claim is DENIED, including

21  on qualified immunity grounds.

22

23  IT IS SO ORDERED.

24  **Dated:   January 30, 2008**              **/s/ Oliver W. Wanger**
                                      UNITED STATES DISTRICT JUDGE

25

26

27

28

                            **31**